IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | **UNDER SEAL** |
| v. | Case No. 1:21-mj-233 |
| CODY SCOTT ALEXANDER | |
| and | |
| DANIEL RAMIREZ | |
| *Defendants*. | |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Tre' M. Smith, Special Agent of the Drug Enforcement Administration ("DEA"), Washington Division Office ("WDO"), Washington, DC, being duly sworn, depose and state the following:

**INTRODUCTION**

1. This affidavit is being submitted in support of a criminal complaint charging CODY SCOTT ALEXANDER (hereinafter, "ALEXANDER") and DANIEL RAMIREZ (hereinafter, "RAMIREZ") with conspiracy to distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section, 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests.

3. I have been a Special Agent ("SA") with the DEA since April 2019. I am currently assigned to Enforcement Group Forty-two at the Washington Division Office, located in the

District of Columbia. While with the DEA, I have investigated and assisted in the investigation of many narcotics traffickers and possessors. I have previously participated in investigations which have led to the arrest and conviction of narcotics dealers and money launderers.

4. Since 2019, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers. In the course of my training and experience I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to seizures of narcotics, firearms, contraband, and drug related assets; and analysis of financial documents and records.

5. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

6. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## Confidential Sources

7. During the course of this investigation, investigators have used three (3) cooperating sources (hereinafter, "CS-1" through "CS-3"). For purposes of this affidavit, all cooperating sources will be referred to in the masculine gender regardless of their true gender. The information provided by all of the cooperating sources has been corroborated by consensually monitored telephone calls, text messages, and other means, when available. To my knowledge, none of the information provided in this investigation by any cooperating sources has proved to be false, misleading, or inaccurate in any material respect.

8. CS-1 started cooperating with law enforcement in 2020. CS-1 is an admitted drug user and distributor and has a limited criminal history with no convictions. CS-1 currently has a pending state drug charge and is cooperating with law enforcement in hopes of consideration on a that pending state drug charge. CS-1 has provided information to law enforcement that has been independently corroborated through the review of downloaded phone content and law enforcement investigation. Based on the foregoing, I consider CS-1 reliable.

9. CS-2 started cooperating with law enforcement in 2020. CS-2 is an admitted drug user and distributor and has prior drug distribution conviction and misdemeanor photo dissemination conviction. CS-2 is cooperating with law enforcement in hopes of receiving credit for cooperation on a pending state drug charge. CS-2 has provided information to law enforcement that has been independently corroborated through the review of downloaded phone content and law enforcement investigation. Based on the foregoing, I consider CS-2 reliable.

10.  CS-3 started cooperating with law enforcement in 2020. CS-3 is an admitted drug user and distributor and has prior convictions for drug possession, possession of firearm while in possession of drugs, and obtaining money by false pretenses. CS-3 is cooperating with law enforcement in hopes of receiving credit for cooperation on a pending state drug charge. CS-3 has provided information to law enforcement that has been independently corroborated through the review of downloaded phone content and law enforcement investigation. Based on the foregoing, I consider CS-3 reliable.

## PROBABLE CAUSE

A.  Background of the Investigation

11.  In or around 2019, law enforcement officers obtained information that a group of individuals were distributing large quantities of methamphetamine throughout the Washington, D.C. metropolitan area. This group utilized, and often shared, sources of supply for multiple-ounce quantities, and at times multiple pounds, of methamphetamine, which they further distributed to customers throughout the Washington D.C. metropolitan area, including in the District of Columbia and Eastern District of Virginia. Law enforcement also learned that these individuals utilized various mailing services (i.e. USPS, UPS, DHL, and FedEx) to ship methamphetamine to the Eastern District of Virginia and elsewhere. Law enforcement has identified ALEXANDER and RAMIREZ as part of this group.

B.  Historical Information provided by CS-1

12.  In or about October 2019, law enforcement encountered a subject during the execution of a search warrant in Washington, D.C. during which a quantity of suspected methamphetamine and smoking devices were seized. The search warrant was executed after law enforcement conducted several undercover purchases of suspected methamphetamine in

Arlington, Virginia. The subject—CS-1—agreed to cooperate with law enforcement in hopes of consideration on pending state drug distribution charges.

13. During interviews, CS-1 admitted that ALEXANDER supplied him with one (1) to two (2) ounce quantities of methamphetamine for further distribution. CS-1 admitted that he had purchased methamphetamine from ALEXANDER on at least ten (10) different occasions.

14. CS-1 told law enforcement that he met with ALEXANDER at 106 Michigan Avenue #D22 NE, Washington, D.C. (hereinafter, "TARGET ADDRESS") when purchasing methamphetamine, and observed ALEXANDER with approximately one-half (1/2) to one (1) pound of suspected methamphetamine. CS-1 admitted that he arranged transactions with ALEXANDER through calls and messages on ALEXANDER's cellular phone, which utilized phone number (202) 253-2793 at that time.

C. Historical Information provided by CS-2

15. In October 2020, law enforcement executed a search warrant in Strasburg, Virginia which resulted in the seizure of approximately six (6) ounces of suspected methamphetamine and the arrest of a subject—CS-2—who agreed to cooperate with law enforcement. CS-2 identified ALEXANDER as the source of supply for the seized methamphetamine. Laboratory testing of the seized substance confirmed that it had a net weight of 157.11 grams of which 153.96 grams were actual methamphetamine.

16. During interviews, CS-2 admitted to meeting ALEXANDER in approximately early 2020 and informed that ALEXANDER provided CS-2 a cellular phone number of (202) 227-8446 (SUBJECT PHONE 1) to utilize to arrange methamphetamine purchases.

17. CS-2 admitted to purchasing methamphetamine from ALEXANDER on numerous occasions throughout 2020, initially purchasing two (2) ounces at a time and later up to

approximately ten (10) ounces at a time. CS-2 admitted that on several occasions, when purchasing methamphetamine from ALEXANDER, he observed ALEXANDER with, what CS-2 estimated was, an additional pound of methamphetamine and scales in TARGET ADDRESS. CS-2 also claimed that ALEXANDER lived with RAMIREZ at TARGET ADDRESS. According to CS-2, RAMIREZ was present on multiple occasions when CS-2 purchased methamphetamine from ALEXANDER.

18. CS-2 informed law enforcement that he learned that RAMIREZ and ALEXANDER were working together to distribute methamphetamine throughout the Washington, D.C. area, and that RAMIREZ and ALEXANDER were having methamphetamine shipped from Arizona.

D. <u>Communications between CS-2 and ALEXANDER</u>

19. During the encounter with law enforcement in October 2020, CS-2 consented to a search of his cellular phones. This revealed communications corroborating CS-2's statements that he worked with ALEXANDER to distribute methamphetamine. CS-2 communicated with ALEXANDER, who utilized SUBJECT PHONE 1. The following table identifies communications between CS-2 and ALEXANDER regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
|---|---|---|
| 10/03/20 | CS-2 | On my way |
| 10/03/20 | ALEXANDER | We didn't make it for the flight |
| 10/03/20 | ALEXANDER | I can have some one meet you though if that is ok |
| 10/03/20 | CS-2 | Yes please |
| 10/03/20 | CS-2 | I am up your way right now |
| 10/03/20 | CS-2 | We good? |

| | | |
|---|---|---|
| 10/03/20 | ALEXANDER | So I'm going to start heading back to Pasadena where I'll be until tomorrow afternoon. Only 30 mins away so text or call anytime (really, anytime) and let me know and I'll shoot back up this way in a hurry |
| 10/04/20 | CS-2 | Good morning. Can I meet with your person today? I have to leave MD around 430 and would really like to see ya before then |
| 10/04/20 | ALEXANDER | I am flying home today finally but won't be there until later again. I can have someone meet you though if you need |
| 10/04/20 | CS-2 | When can they meet? I'm still in MD and can e there in an hour |
| 10/04/20 | ALEXANDER | Let me check |
| 10/04/20 | CS-2 | Any word? I have to be back in VA before too long |
| 10/04/20 | ALEXANDER | +1 (202) 553-4886 here is his number his name is Chris |
| 10/04/20 | CS-2 | Thanks. I'll text him |
| 10/04/20 | CS-2 | He just texted and said he wasn't available. Please let me know what to do, or let me know when you will be available. It'll be a good bit. |
| 10/04/20 | ALEXANDER | That was the wrong number? Lol |
| 10/04/20 | ALEXANDER | (302) 377-9587 |
| 10/04/20 | ALEXANDER | Here is his. You text another bud who lives in my development. |

| 10/04/20 | CS-2 | Ok. Texting now |
|---|---|---|
| 10/04/20 | ALEXANDER | We had you at how much per? |
| 10/04/20 | CS-2 | 600. Trying to get 12 if I can |
| 10/04/20 | ALEXANDER | I can only do the Qp today |
| 10/04/20 | CS-2 | Ok |
| 10/04/20 | CS-2 | Can I come see you tomorrow evening also? |
| 10/04/20 | ALEXANDER | I think that will work |
| 10/04/20 | CS-2 | I meet him at 7 |
| 10/04/20 | ALEXANDER | Does that work for you? |
| 10/04/20 | CS-2 | It does. Thank you |
| 10/04/20 | ALEXANDER | Cool. So these will be 600 each. Hit when you come next I'll cut a break for you to include these |

20. Through my knowledge of this investigation and discussions with CS-2, I believe that in the above table of messages, CS-2 and ALEXANDER discussed purchasing methamphetamine. CS-2 requested to purchase twelve (12) ounces, but ALEXANDER told him that he could only arrange for him to purchase a "Qp" (common drug slang for a quarter pound or 4 ounces) through an additional unindicted co-conspirator (hereinafter, "UCC-1"). ALEXANDER then agreed to sell CS-2 each ounce of methamphetamine for $600.

21. On October 5, 2020, CS-2 and ALEXANDER exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 10/05/20 | CS-2 | Hey buddy, what's a good time to see you tonight? If you're back in town, that is. |

| 10/05/20 | ALEXANDER | When works for you. I'm around all evening |
| --- | --- | --- |
| 10/05/20 | CS-2 | Ok. I have to go pick up a freezer, but I'll let you know when I leave to head your way |
| 10/05/20 | ALEXANDER | Ok cool |
| 10/05/20 | CS-2 | 11:15 is that ok? |
| 10/05/20 | ALEXANDER | Yeah and you want 8 more right? |
| 10/05/20 | CS-2 | 10 if I can? |
| 10/05/20 | ALEXANDER | Sure |

22. Through my knowledge of this investigation and discussions with CS-2, during the above exchange, ALEXANDER agreed to supply CS-2 with ten (10) ounces of methamphetamine.

E. Controlled purchase of methamphetamine on November 18, 2020

23. On or about November 18, 2020, under the direction and supervision of law enforcement, CS-2 made a controlled purchase of a quantity of suspected crystal methamphetamine from ALEXANDER at TARGET ADDRESS. Both before and after the controlled purchase, law enforcement searched CS-2 for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location. CS-2 met with ALEXANDER, inside of TARGET ADDRESS, to conduct the transaction. According to CS-2, ALEXANDER provided him with the methamphetamine that he subsequently turned over to law enforcement. This controlled purchase was audio recorded, and I can confirm the recording corroborates CS-2's statements. Laboratory testing of the substance confirmed that it had a net weight of 227.9 grams of which 227.9 grams were actual methamphetamine.

F. <u>Historical Information provided by CS-3</u>

24. In October 2020, in Arlington, Virginia, law enforcement arrested a subject—CS-3—during a traffic stop during which law enforcement seized approximately one-half (1/2) ounce of suspected methamphetamine. CS-3 agreed to cooperate with law enforcement and identified RAMIREZ as the source of supply for the seized suspected methamphetamine. Law enforcement performed a preliminary field-test which resulted in a positive response for methamphetamine.

25. CS-3 informed law enforcement that he had met RAMIREZ approximately one (1) year prior and was aware that he lived with ALEXANDER in Washington, D.C. at TARGET ADDRESS. CS-3 told law enforcement he had purchased between a half (1/2) to one (1) ounce of methamphetamine from RAMIREZ on at least five (5) occasions.

26. CS-3 explained that ALEXANDER and RAMIREZ would travel to Arizona to obtain methamphetamine, which they would mail back to the Washington, D.C. area. CS-3 further admitted that he had accepted two United States Postal Service (USPS) parcels on RAMIREZ's behalf at his (CS-3's) residence in Vienna, Virginia. USPS confirmed that during the time frame indicated by CS-3, two (2) USPS parcels were shipped from Arizona to CS-3's address.

27. CS-3 further admitted that he opened one (1) of the packages and discovered that, by his estimation, it contained approximately one (1) pound of suspected methamphetamine. The suspected methamphetamine was concealed among innocuous items such as pens, notebooks, and other "school supplies." When RAMIREZ returned from Arizona, CS-3 delivered the packages to RAMIREZ at TARGET ADDRESS.

G. <u>Communications between CS-3 and RAMIREZ</u>

28. During the encounter with law enforcement in October 2020, CS-3 consented to a search of his cellular phones. This revealed communications corroborating CS-3's statements that

10

he worked with RAMIREZ to distribute methamphetamine. CS-3 communicated with RAMIREZ on 202-855-3533. The following table identifies communications between CS-3 and UCC-1 regarding the purchase of methamphetamine.

| DATE | FROM | MESSAGE |
|---|---|---|
| 10/03/20 | RAMIREZ | Hey ur getting a package today |
| 10/03/20 | CS-3 | Received |
| 10/03/20 | CS-3 | In hand and safely put away unopened for you sir |
| 10/04/20 | RAMIREZ | Just made it back. Possible fir unto bring those items and I can take u back home. I'll need the car overnight but u can have it back tomorrow. Unless you sold if an that would be amazing. |
| 10/04/20 | RAMIREZ | We still need to settle up from before I left |
| 10/04/20 | CS-3 | Yes sir I know I owe you quite a bit |
| 10/04/20 | CS-3 | I'm here want me to come in |
| 10/04/20 | CS-3 | I don't think you want to drive around with this |
| 10/04/20 | RAMIREZ | Nah there way to many people in here I'll come get with a bag |
| 10/04/20 | CS-3 | Ok |

29.     Through my knowledge of this investigation and discussions with CS-3, I believe that during the above exchange, RAMIREZ and CS-3 discussed packages containing methamphetamine that had been shipped to CS-3's residence prior to CS-3's cooperation with law enforcement.

H.      Controlled Purchase of methamphetamine on November 24, 2020

30.     On or about November 24, 2020, under the direction and supervision of law enforcement, CS-3 made a controlled purchase of a quantity of suspected methamphetamine from RAMIREZ in Washington, D.C. Both before and after the controlled purchase, law enforcement searched CS-3 for contraband with negative results. Law enforcement conducted surveillance of the arranged meeting location. CS-3 met with RAMIREZ in the parking lot outside of TARGET ADDRESS to conduct the transaction. According to CS-3, RAMIREZ provided him with the methamphetamine that he later provided to law enforcement. This controlled purchase was audio recorded, and I can confirm the recording corroborates CS-3's statements. Laboratory testing of the substance confirmed that it had a net weight of 28.420 grams of which 27.567 grams were actual methamphetamine.

I.      Law enforcement seizure of methamphetamine on November 27, 2020

31.     During the week of November 25, 2020, CS-3 informed law enforcement that RAMIREZ contacted his cellular telephone and asked him to receive parcels containing methamphetamine shipped from Arizona at CS-3's residence in Vienna, Virginia. On November 27, 2020, law enforcement intercepted two (2) USPS parcels at Dulles International Airport that had been shipped from Arizona. Law enforcement obtained a federal search warrant for both packages in the Eastern District of Virginia, which led to the discovery of a total of approximately two (2) pounds of suspected methamphetamine. Laboratory testing of the substance confirmed that it had a net weight of 893.4 grams of which 838.8 grams were actual methamphetamine. Based on my training and experience and knowledge of this investigation, I believe both RAMIREZ and ALEXANDER had an interest in that seized methamphetamine and that they both intended to sell portions of it.

J.      Subscriber information and call detail records obtained from AT&T for 202-227-8446 (SUBJECT PHONE 1)

32. Law enforcement obtained subscriber information and call detail records from AT&T for SUBJECT PHONE 1, the phone number identified as being used by ALEXANDER, for the period running from roughly October 2020 to February 2021. According to these records, SUBJECT PHONE 1 is subscribed to "Cody ALEXANDER, 106 Michigan Ave. NE #22D, Washington, D.C. 20017."

K.      Law enforcement seizure of methamphetamine on February 23, 2021

33. During the week of February 21, 2021, based on information obtained through this investigation, law enforcement learned of four (4) USPS packages that had been shipped from Arizona to addresses previously connected to ALEXANDER and RAMIREZ through this investigation. On February 23, 2021, law enforcement intercepted one of the four USPS packages in Maryland, which was addressed to "Base Camp" in Washington, D.C. Prior investigation in this case revealed that ALEXANDER had previously had methamphetamine packages shipped to the "Base Camp" location. This information was corroborated by USPS records according to United States Postal Inspection Service Inspector Copeland. Additionally, the seized package had the same sender listed on the label as the package containing methamphetamine that was seized by law enforcement in Vienna, Virginia on November 27, 2020, as discussed in paragraph 31 of this affidavit. Law enforcement obtained a federal search warrant in the District of Maryland for that parcel addressed to "Base Camp," which led to the discovery of approximately two (2) pounds of suspected methamphetamine. Laboratory testing of the substance confirmed that it had a net weight of 751.9 grams of which 714.3 grams were actual methamphetamine. Based on my training and experience and knowledge of this investigation, I believe both RAMIREZ and ALEXANDER had an interest in this methamphetamine and that they both intended to sell portions of it.

  L. <u>USPS Postal Service Records from March 19 through 20, 2021</u>

  34. Based on information obtained through USPS records, law enforcement learned of five (5) USPS packages that had been shipped from Arizona to addresses in the Washington, D.C. area on March 19, 2021 or March 20, 2021. One of those five USPS packages was mailed to TARGET ADDRESS. Law enforcement obtained video of the individual who mailed several of those five packages in Arizona and have positively identified that individual as ALEXANDER. The characteristics of the five packages, including the weight, shipping location, and receiving locations, are consistent with prior USPS packages containing methamphetamine that had been seized by law enforcement as part of the investigation.

  M. <u>Law enforcement surveillance of TARGET ADDRESS on March 23 through 24, 2021.</u>

  35. On March 23, 2021, law enforcement observed one of the packages shipped from Arizona on March 20, 2021 delivered by a USPS employee to an outdoor mailbox location for the apartment building located at 106 Michigan Avenue NE, Washington, D.C. 20017. That building houses the TARGET ADDRESS. Law enforcement observed ALEXANDER exit the building, retrieve the USPS package, and return into the apartment building.

  36. On March 24, 2021, law enforcement surveillance observed the delivery of a second of the USPS packages mailed from Arizona on March 20, 2021. That package was addressed to an apartment building located at 140 Michigan Avenue NE, Washington, D.C. 20017, which is located a few buildings away from TARGET ADDRESS. Shortly after law enforcement observed the delivery of that USPS package, law enforcement observed an individual who retrieved the package and entered the apartment building located at 140 Michigan Avenue NE, Washington, D.C. 20017. Law enforcement later observed ALEXANDER walk from 106 Michigan Avenue NE, Washington, D.C. 20017 to 140 Michigan Avenue NE, Washington, D.C.

20017, and then observed ALEXANDER return to 106 Michigan Avenue NE, Washington, D.C. 20017 (building that houses the TARGET ADDRESS), carrying a USPS parcel.

37. A short time later, law enforcement observed RAMIREZ arrive at 106 Michigan Avenue NE, Washington, D.C. 20017. After a short period, law enforcement observed ALEXANDER and RAMIREZ exit together from the apartment building located at 106 Michigan Avenue NE, Washington, D.C. 20017.

N. Information obtained from electronic surveillance

38. Between April 4, 2021, and May 25, 2021, law enforcement monitored cell-site data and E-911 phase II data ("cell phone location data"), obtained via two federal search warrants issued in the Eastern District of Virginia, for the cellular phone of ALEXANDER (SUBJECT PHONE 1) and the cellular phone of RAMIREZ (phone number (202) 855-3533). The cell phone location data showed that the cell phones of both ALEXANDER and RAMIREZ were located in the direct vicinity of the TARGET ADDRESS on an almost daily basis for extended periods of time, which usually included the overnight hours.

39. A review of call detail records for SUBJECT PHONE 1 showed between May 22, 2021 and May 24, 2021 there were calls from SUBJECT PHONE 1 to a phone number affiliated with the suspected resident of 140 Michigan Avenue NE, Washington, D.C. 20017 where suspected drug parcels had been mailed to previously, as discussed in paragraph 36 of this affidavit. Those call detail records also showed that between May 22, 2021 and May 25, 2021 there were calls from SUBJECT PHONE 1 to phone numbers in Phoenix, Arizona, which law enforcement identified as phone numbers that SUBJECT PHONE 1 previously called during the time frames when prior suspected drug parcels were shipped, including in March of 2021.

40. On May 25, 2021, law enforcement served an Administrative Subpoena with

American Airlines for travel records pertaining to ALEXANDER. Information from that administrative subpoena was received that showed ALEXANDER had booked a flight from Reagan National Airport (DCA) to Phoenix, Arizona (PHX) on May 25, 2021. Law enforcement was able to confirm that ALEXANDER boarded the flight to Phoenix, Arizona and ALEXANDER checked no luggage.

41. Data from the cell phone location data also showed SUBJECT PHONE 1 in Phoenix, Arizona.

O. <u>Execution of search warrant at TARGET ADDRESS on June 4, 2021</u>

42. On June 4, 2021, law enforcement executed a federal search warrant at TARGET ADDRESS. RAMIREZ was present during the execution of the warrant. During the execution of the search warrant, law enforcement seized approximately two (2) pounds of suspected crystal methamphetamine, approximately twenty (20) to twenty-five (25) gallons of suspected GBL/GHB. Law enforcement conducted a preliminary field-test on the suspected methamphetamine, which resulted in a positive response for methamphetamine. In addition to the narcotics, the search of the TARGET ADDRESS resulted in the discovery of $41,447 in cash. When searching the TARGET ADDRESS, $21,447 of the total of $41,447 recovered was located in a bedroom identified as belonging to RAMIREZ. Law enforcement later reviewed the $21,447 and found pre-recorded law enforcement buy funds (specifically, two (2) $50 bills) that had been utilized in the controlled purchase of methamphetamine from RAMIREZ on November 24, 2020.

P. <u>Post-Miranda Statement of RAMIREZ on June 4, 2021</u>

43. On June 4, 2021, RAMIREZ was advised of his Miranda Rights and he agreed to speak with law enforcement without counsel. RAMIREZ admitted to accompanying ALEXANDER to Arizona in the Fall of 2020. When confronted, he also admitted to assisting

ALEXANDER in the shipments of packages containing methamphetamine that were shipped to Vienna, Virginia (mentioned in SMS messages in paragraph 26 of this affidavit) by providing the Vienna address to ALEXANDER.

44. RAMIREZ related that other packages that were shipped from Arizona to the Washington, D.C. area by ALEXANDER usually contained at least one (1) pound of methamphetamine.

45. When asked what law enforcement would locate in the TARGET ADDRESS, RAMIREZ admitted that there was methamphetamine and GHB in ALEXANDER's room. RAMIREZ also identified a photograph of UCC-1 and identified him a methamphetamine customer of ALEXANDER.

Q. <u>Law enforcement seizure of methamphetamine in May 2021</u>

46. During the week of May 23, 2021, based on information obtained through this investigation, law enforcement learned of four (4) USPS packages that had been shipped from Arizona to addresses previously connected to ALEXANDER and RAMIREZ. Law enforcement intercepted three (3) of the USPS packages. Law enforcement obtained a federal search warrant in the District of Columbia for the three packages which led to the discovery of a total of approximately six (6) pounds of suspected methamphetamine. Law enforcement obtained surveillance video from the Arizona USPS locations where the seized packages had been shipped which showed ALEXANDER mailing the packages. Law enforcement performed a preliminary-field test on the suspected methamphetamine which resulted in a positive response for methamphetamine. Based on my training and experience and knowledge of this investigation, I believe both RAMIREZ and ALEXANDER had an interest in this methamphetamine and that they both intended to sell portions of it.

## **CONCLUSION**

47. Based upon the foregoing, I believe probable cause exists that from in and around the end of 2019 to present, within the Eastern District of Virginia and elsewhere, CODY SCOTT ALEXANDER and DANIEL RAMIREZ, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute fifty (50) grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

_____
Tre' M. Smith
Special Agent
Drug Enforcement Administration

Sworn and subscribed to me in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on this \_\_8th\_\_ day of July, 2021.

_____
Digitally signed by Ivan Davis
Date: 2021.07.08 12:06:37 -04'00'

The Honorable Ivan D. Davis
United States Magistrate Judge